[Cite as *State v. Young*, 2020-Ohio-462.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 18AP-630 |
| | | (C.P.C. No. 15CR-2907) |
| v. | : | No. 18AP-631 |
| | | (C.P.C. No. 15CR-5481) |
| Dante M. Young, | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on February 11, 2020

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee. **Argued:** *Michael P. Walton*.

**On brief:** *Yeura R. Venters*, Public Defender, and *Craig M. Jaquith*, for appellant. **Argued:** *Craig M. Jaquith*.

APPEALS from the Franklin County Court of Common Pleas

SADLER, P.J.

{¶ 1} Defendant-appellant, Dante M. Young, appeals from the July 25, 2018 judgment entries[1] of the Franklin County Court of Common Pleas finding appellant guilty of two counts of murder, kidnapping, and tampering with evidence. For the following reasons, we affirm the trial court judgments.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On June 15, 2015, appellant was indicted on one count of tampering with evidence pursuant to R.C. 2921.12, a third-degree felony. A few months later, on

---

[1] This court sua sponte consolidated the appeals docketed under case Nos. 18AP-360 (concerning tampering with evidence conviction) and 18AP-631 (concerning murder and kidnapping convictions) for purposes of record filing, oral argument, and determination.

November 6, 2015, appellant was indicted on one count of murder pursuant to R.C. 2903.02(A) with a firearm specification, one count of murder pursuant to R.C. 2903.02(B) with a firearm specification, and kidnapping pursuant to R.C. 2905.01, a first-degree felony, also with a firearm specification. The cases were consolidated into a single action for purposes of trial. Appellant entered a plea of not guilty to all charges, and the matter proceeded to a jury trial held from April 16 to 20, 2018.

{¶ 3} At trial, plaintiff-appellee, State of Ohio, presented the theory that, although appellant did not pull the trigger that killed the victim, Courtney Elmore, appellant was guilty of the charges by way of complicity as an aider and abettor. As its key witness, the state called Chiquetta Hager.

{¶ 4} Ms. Hager testified that she met appellant when they were both 16 years old and that she has been in a relationship with him ever since. Appellant and Ms. Hager have children together and lived together throughout their relationship. She testified she was on good terms with appellant and testifying against him was difficult.

{¶ 5} In May 2015, Ms. Hager lived in a house on Velma Avenue in Columbus with appellant. Ms. Hager admitted to using drugs—pills, heroin, cocaine—since she was about 17 and said appellant used those drugs as well. Ms. Hager testified that both she and appellant sold drugs from the house on Velma Avenue.

{¶ 6} According to Ms. Hager, on May 29, 2015, four men entered her house while she was home. Appellant, their six-year-old son, and a friend were also present. The men fired a shot, beat her and appellant with a gun, and ran away with some of their money and drugs. Afterward, a group of people came to her house and discussed the robbery with Ms. Hager and appellant. The group included her two cousins (Antwon Hager and Dante Brady[2]), appellant's half-brother (Davon Granger), and Mr. Elmore, who Ms. Hager described as a "close friend" she had known for about five years. (Tr. Vol. 2 at 271.) Ms. Hager testified Mr. Elmore was also a close friend of appellant. Appellant and Mr. Elmore had gone to school together, and Mr. Elmore would occasionally stay at their home. Ms. Hager and appellant's children called Mr. Elmore "uncle." (Tr. Vol. 2 at 272.)

---

[2] The record also cites "Dante Brad*ley*"; a police homicide detective noted several variations of this name were given to police. (Tr. Vol. 3 at 474-75, 483.)

{¶ 7} Ms. Hager agreed the mood of the group was "angry" in discussing the robbery and testified they wanted to figure out who was involved. (Tr. Vol. 2 at 270.) According to Ms. Hager, two of the people who robbed them were associated with Mr. Elmore, and she believed that is how the robbers knew where she and appellant lived. Ms. Hager testified that they did not report the robbery to police because of the "things that were illegally happening in the house." (Tr. Vol. 2 at 363.)

{¶ 8} The following day, May 30, 2015, appellant's friend dropped off a small, black gun—an "automatic[, not] a revolver"—at their house for "protection." (Tr. Vol. 2 at 275, 352.) At some point that day, Mr. Elmore, appellant, and Ms. Hager went to get Xanax and then returned to her house. According to Ms. Hager, Mr. Elmore spoke to one of the people involved in the robbery on his cell phone and lacked concern doing so. Mr. Elmore had to return home, so Ms. Hager drove him there and dropped him off.

{¶ 9} The next day, May 31, 2015, a group again came over to appellant and Ms. Hager's house and discussed the robbery. The group included Mr. Hager, Brady, her cousins' friend, Ms. Hager's younger brother, Granger, and Granger's girlfriend "Shae." (Tr. Vol. 2 at 285.) Although no one had been suspicious of Mr. Elmore previously, Ms. Hager found Mr. Elmore's cell phone in her van and discovered text messages between Mr. Elmore and the robbers implicating him in the robbery. Ms. Hager told appellant what she found and gave him Mr. Elmore's phone.

{¶ 10} According to Ms. Hager, appellant shared the information implicating Mr. Elmore with the group at their house, and the group began talking about "what needed to happen to [Mr. Elmore]." (Tr. Vol. 2 at 284.) Specifically:

> They talked about, you know, inflicting pain on [Mr. Elmore] from what I heard, but that is just everything was just hyped up and was saying like, you know, it was fucked up, how everything happened, and that [Mr. Elmore] needed to, you know, let us know where these other guys were.
>
> * * *
>
> They were going to ask [Mr. Elmore] about it, confront him.

(Tr. Vol. 2 at 285-86.) The prosecutor then asked Ms. Hager what the plan was and indicated she could "use the words if [she could] recall." (Tr. Vol. 2 at 285.) Ms. Hager answered:

> I mean, there was some talk about, you know, bringing him back to the house and putting him in the basement and, you know, basically trying to, you know, do whatever they needed to do to get the information out of him * * * as far as, you know, inflicting pain.

(Tr. Vol. 2 at 285-86.) According to Ms. Elmore, Granger did not say much, and it was her cousins that were "real hyper about it" and feeding off of each other, saying "[c]ome on, we need to go now." (Tr. Vol. 2 at 287.) At some points in testifying, Ms. Hager agreed there was a "plan" to bring Mr. Elmore back to the house, put him in the basement, and hurt him until he talked, and, at other points, Ms. Hager said the conversation was less a plan than everyone just talking and "saying what needed to happen." (Tr. Vol. 2 at 286, 287.) Although Ms. Hager assumed they were just going to confront Mr. Elmore, she agreed violence was on the table.

{¶ 11} Ms. Hager confirmed appellant was part of this conversation and was coherent—up moving around and talking—despite doing drugs that day. According to Ms. Hager, there were also "times where we were in the bedroom getting high because we didn't want everybody to know what we were doing. * * * Me and him both was in and out, you know. Like I said, I can't – I don't know what conversation took part in the kitchen because I wasn't there." (Tr. Vol. 2 at 289-90.) Ms. Hager agreed with the statement that appellant was the person that provided the information about Mr. Elmore's involvement in the robbery to the group and testified that appellant "didn't disagree" with the plan to "mess * * * up" Mr. Elmore and went along with the plan. (Tr. Vol. 2 at 371.)

{¶ 12} At some point, when Ms. Hager was in the bedroom, her cousin Brady came to get her in order to head to Mr. Elmore's house, which was located about six minutes away. Ms. Hager testified that before getting into the van, Granger retrieved a gun—a silver revolver—out of his car. Ms. Hager asked Granger if he wanted her to "hold it" and he declined. (Tr. Vol. 2 at 296.) At that point in time, Ms. Hager did not know her cousin Brady had appellant's gun as well. The whole group got in Ms. Hager's white van: Ms. Hager was in the driver's seat, appellant was in the front passenger seat, Shae and Granger sat in the middle row, and Mr. Hager, Brady, and a friend sat in the back row. Ms. Hager testified that she drove to Mr. Elmore's house on Willamont Avenue and, once there, went up to his house and asked for him. According to Ms. Hager, she told Mr. Elmore that his

phone was in the car and they needed to talk, and Mr. Elmore proceeded back to the van with her.

{¶ 13} According to Ms. Hager, she got into the driver's seat while Mr. Elmore walked around to the other side of the van, entered the van, and was in the process of closing the door when "he got shot." (Tr. Vol. 2 at 300.) She turned around and saw Mr. Elmore getting "thrown" or "kicked" out of the van by Granger, who said "[g]et the fuck out." (Tr. Vol. 2 at 300, 301.) Ms. Hager specified that she heard two gunshots but did not see who shot him.

{¶ 14} Shae screamed, and Ms. Hager drove away. At some point, Granger said "[i]t had to happen" and her cousin Brady was "backing him up, like, yeah, yeah, yeah." (Tr. Vol. 2 at 305.) Otherwise, the group was silent. Ms. Hager testified she and appellant talked about getting Mr. Elmore help but did not do it and instead went back to their house. Appellant, Granger, and Shae went into the house, and Brady went across the street to her aunt's house. After a discussion that the van "needed to be secluded," Ms. Hager, Mr. Hager, and his friend put the van into the garage, a "complicated" endeavor since she rarely used the garage. (Tr. Vol. 2 at 309.)

{¶ 15} Ms. Hager testified that once back at the house, she learned for the first time, from appellant, that her cousin Brady had appellant's gun in the van during the shooting. At some point, she found out a description of her van was on the news and overheard appellant on the phone with Granger discussing "trying to get everything out of the house," including appellant saying the gun needed to go in the sewer and discussing the license plates on the van and cell phones. (Tr. Vol. 2 at 314.) According to Ms. Hager, appellant then told Ms. Hager to get the tags off the car—30-day paper tags—and burn them, which she did, and told her to get a couple of numbers off of his phone and then give the phone to Granger. Granger came back to the house, and Ms. Hager gave appellant's and Mr. Elmore's cell phones to Granger. Ms. Hager testified that it was her understanding from hearing appellant speak that the gun and phones were going to be thrown in the sewer.

{¶ 16} Because the police were looking for her van and had her name, appellant and Ms. Hager then left the Velma Avenue house and stayed with her brother before going to her dad's house to hide out. Appellant and Ms. Hager were at her dad's house for about one week; according to Ms. Hager, appellant told her they needed to talk to detectives about

what happened, but they "never got around to it."  (Tr. Vol.2 at 318.)  During their time hiding out, appellant and Ms. Hager met with Granger once:  Granger gave appellant some money and drugs.

{¶ 17}  Ms. Hager was arrested in June 2015 and spoke to law enforcement that day and three times afterward.  Ms. Hager admitted that when she first spoke to detectives, she did not tell them everything she had testified to and had given them "multiple stories" because she did not want to involve people.  (Tr. Vol. 2 at 323.)  She provided the detectives the same basic facts of what happened but left out appellant's involvement in the incident entirely "[b]ecause he is the father of [her] kids" and also did not discuss the guns.  (Tr. Vol. 2 at 323.)  She did not reveal appellant's involvement until her last interview with detectives.  In Ms. Hager's view, she "kept information [from police]—[she] wasn't lying. [She] just withheld information."  (Tr. Vol. 2 at 345.)

{¶ 18}  Eventually, Ms. Hager signed an agreement to cooperate with the state.  Per the agreement, in exchange for her truthful testimony, Ms. Hager would plead guilty to abduction and involuntary manslaughter and receive eight years in prison as part of a joint recommendation.  Ms. Hager testified her motivation for testifying included doing the right thing and bringing closure to Mr. Elmore's family, as well as her desire to get out of prison and see her children.  Ms. Hager testified she had been in jail for about three years, was sober, and had plans to further her education and get back into her kids' lives.

{¶ 19}  Reflecting on Mr. Elmore's shooting, in response to the question "[d]id you think something bad was going to happen," Ms. Hager testified:

> Um, I kind of know how [Mr. Elmore] is, and he is one of those type of people that would have just been up front with the situation, like, once you sit down and talk to him.  So in my head I thought it wasn't going to be taken to that extent because I know him.

(Tr. Vol. 2 at 307.)  Ms. Hager testified she did not think Mr. Elmore would be killed, but there was a possibility he would be hurt if he did not provide them information.  Ms. Hager further testified Brady and Granger never admitted to pulling the trigger specifically. Rather, they just said "[i]t had to happen and that it was over the fact that they came into the house and my son was there."  (Tr. Vol. 2 at 320.)  According to Ms. Hager, appellant felt terrible that Mr. Elmore was killed, "was affected by it," and showed remorse.  (Tr. Vol. 2 at 359.)

{¶ 20} In addition to calling Ms. Hager to testify, the state also called as a witness Thomas Gravely, a neighbor of Mr. Elmore. Gravely testified he was sitting on his front porch when a white truck or van arrived on the street. According to Gravely, a woman got out of the driver's side and looked "scared to death." (Tr. Vol. 1 at 50.) The woman went to the house on the corner, brought a man back to the van, and walked to the driver's side while the man walked to the passenger side. The man stepped to the van by the side door, Gravely heard two or three shots in quick succession, and the man appeared to be dead and laying on the ground. The van "took off and went around the corner." (Tr. Vol. 1 at 53.) Gravely called the police and gave a statement.

{¶ 21} Mr. Elmore's cousin, Kenya Elmore, testified that she lived in the Willamont Avenue house with Mr. Elmore and her sister. According to Ms. Elmore, Mr. Elmore, who had previously been involved in drug use, began using drugs again. Ms. Elmore said she had been introduced to Ms. Hager and appellant through Mr. Elmore and described Ms. Hager and appellant as "known drug associates" of Mr. Elmore. (Tr. Vol. 1 at 71.) On May 30, 2015, Ms. Elmore saw appellant with a "gash" or injury on his face. (Tr. Vol. 1 at 77.) The next day, May 31, 2015, Ms. Elmore saw Mr. Elmore get in a white van with appellant and Ms. Hager around midday and return about one hour later. Mr. Elmore complained he had left his cell phone in the van. Ms. Elmore testified that later that same day, around 8:00 p.m., Ms. Hager knocked on the door and asked for Mr. Elmore. Ms. Elmore and her sister had a conversation about why the van was parked down the street, about four or five houses down on the opposite side. Mr. Elmore then left with Ms. Hager. About one minute later, Ms. Elmore's sister yelled for her, and Ms. Elmore saw Mr. Elmore laying on the ground. Ms. Elmore testified she ran to Mr. Elmore, but he was deceased. She did not see any blood around the area.

{¶ 22} A homicide detective called by the state testified that appellant eventually admitted to being in the van and having a plan to bring Mr. Elmore back to the house to talk to him about the robbery but denied knowing Mr. Elmore would be shot, knowing that anyone in the van had a gun, or knowing what happen to the van license plates; a video interview of appellant reflecting this conversation was played for the jury. Detectives called by the state testified that a shell casing was found close to Mr. Elmore's body, and blood consistent with Mr. Elmore's DNA was found on the passenger side door frames of the van.

A witness from the Columbus Police Crime Lab testified that the two bullets extracted from Mr. Elmore's skull were a spent .38 caliber and a spent .25 caliber, which in her opinion were fired from different guns, and the casing recovered from the scene was a ".380 auto casing."  (Tr. Vol. 2 at 247.)  A deputy coroner from the Franklin County Coroner's Office testified that either bullet wound have been fatal individually.

{¶ 23}  Appellant moved for acquittal on all counts under Crim.R. 29; the trial court denied appellant's motions.  Appellant declined to present defense witnesses, and the trial court proceeded to instruct the jury.  The jury was instructed that appellant "may be convicted as a principal offender or as a complicitor or an aider and abettor to any or all counts of the specifications of the indictment" and was provided a definition of complicity that specified appellant must share the same purpose or intent as required by the offense under consideration.  (Tr. Vol. 3 at 537; Apr. 20, 2018 Jury Instructions at 7.)  The jury was instructed that evidence may be direct or circumstantial and does not include the indictment or opening statements or closing arguments of counsel and that the jury, as the sole judges of the facts and credibility of the witnesses, may believe or disbelieve all or any part of the testimony of any witness.

{¶ 24}  During deliberations, the trial court received two questions from a member or members of the jury: "If the outcome of the evening of May 31st changed the original intent, if the defendant had no knowledge (but he had knowledge of original intent), can [appellant] be found [guilty of murder for] 'failing to act?' " and "[d]oes complicity overrule purpose or acting purposefully in Count 1 for murder?"  (Tr. Vol. 3 at 600.)  The trial court, without objection, responded by referring the jury back to the definitions of "cause," "complicity," and "purpose" provided in the jury instructions.

{¶ 25}  The jury ultimately returned verdicts of: guilty as to murder in Count 1 of the indictment, further finding appellant "DID" have a firearm on or about his person or under his control while committing the offense; guilty as to murder in Count 2 of the indictment, further finding appellant "DID" have a firearm on or about his person or under his control while committing the offense; guilty as to kidnapping in Count 3 of the indictment, further finding appellant "DID NOT" have a firearm on or about his person or under his control while committing the offense; and guilty as to tampering with evidence.  (Emphasis sic.) (Apr. 23, 2018 Verdict Forms.)

{¶ 26} Following a sentencing hearing, for Franklin C.P. No. 15CR-5481, the trial court merged the two murder counts in the indictment and sentenced appellant to 15 years to life for murder in Count 1, consecutive to 5 years for kidnapping, consecutive to 36 months mandatory incarceration on the firearm specification on Count 1 for a total sentence of 23 years to life. The trial court ran the sentence imposed for Franklin C.P. No. 15CR-5481 concurrent to the 36-month term of incarceration imposed for the tampering with evidence charge in Franklin C.P. No. 15CR-2907.

{¶ 27} Appellant filed timely appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 28} Appellant assigns the following as trial court error:[3]

[1.] Prosecutorial misconduct denied Mr. Young a fair trial and due process of law, in violation of his Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution, Article I, Sections 10 and 16, of the Ohio Constitution.

[2.] The trial court erred in denying Dante Young's Crim.R. 29 motion for acquittal for murder under R.C. 2903.01(A), and violated his rights to due process and a fair trial when, in the absence of sufficient evidence, it convicted him on Count 1. Fifth and Fourteenth Amendments, United States Constitution; Article I, Sections 10 and 16, Ohio Constitution.

[3.] Mr. Young's kidnapping conviction was against the manifest weight of the evidence.

[4.] Mr. Young's murder convictions under R.C. 2903.01(A) and (B) were against the manifest weight of the evidence.

[5.] The trial court committed plain error when it allowed improper hearsay testimony.

[6.] Dante Young was deprived of his constitutional right to the effective assistance of counsel. Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Article I, Sections 10 and 16, Ohio Constitution.

---

[3] Appellant's citation to R.C. 2903.01(A) and (B) in his assignments of error appears to be a typographical error, as Counts 1 and 2 of the indictment and the jury's finding of guilt on those counts were based on R.C. 2903.02(A) and (B). Throughout this appeal, we will consider appellant's argument against his murder convictions as a challenge to R.C. 2903.02(A) and (B). In addition, we note this court originally granted appellant's motion to submit, pro se, one additional assignment of error pertaining to jury instructions and granted appellant's motion for additional time to file the assignment of error. However, we ordered appellant's pro se brief stricken for failing to comply with this court's entry.

## III.  LEGAL ANALYSIS

### A.  Appellant's First Assignment of Error

{¶ 29}  In his first assignment of error, appellant contends he was denied due process of law due to prosecutorial misconduct.  For the following reasons, we find the instances of prosecutorial conduct identified by appellant, viewed in isolation or collectively, do not rise to the level of plain error warranting reversal of his convictions.

{¶ 30}  "When reviewing allegations of prosecutorial misconduct, the test for appellate courts is whether the prosecutor's conduct was improper, and if so, whether that conduct prejudicially affected the substantial rights of the accused."  *State v. R.I.H.*, 10th Dist. No. 18AP-93, 2019-Ohio-2189, ¶ 44, citing *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 57 (10th Dist.).  " '[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.' "  (Internal quotations and citations omitted.)  *R.I.H.* at ¶ 44, quoting *State v. Wilkerson*, 10th Dist. No. 01AP-1127, 2002-Ohio-5416, ¶ 38.

{¶ 31}  Appellant specifically argues: (1) the prosecutor "made improper statements in its opening [statement] and in voir dire that eviscerated the presumption of innocence"; (2) "failed to correct a material falsehood that occurred during the testimony of the State's key witness"; and (3) vouched for the credibility of its own key witness.  (Appellant's Brief at 5.)  Appellant did not object to these alleged instances of prosecutorial misconduct, but he argues reversal is nevertheless required under the plain error standard of review since, given that his convictions "hinged entirely on the credibility of one State's witness," there is a reasonable probability the prosecutorial misconduct affected the outcome of the trial. (Appellant's Brief at 5.)

{¶ 32}  We will exercise our discretion and proceed to address appellant's arguments under the plain error standard of review.  A court will find plain error only when (1) there was an error, (2) the error was "plain," i.e., obvious, and (3) the error "affected substantial rights."  *State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, ¶ 217, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).  *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22 (specifying third prong employs "the same deferential standard for reviewing ineffective assistance of counsel claims").  "[T]he accused bears the burden of proof to demonstrate plain error on the record."  *Id.*, citing *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-

4034, ¶ 16.  "But even if an accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it; we have admonish[ed] courts to notice plain error with the utmost caution, under exceptional circumstances and *only* to prevent a manifest miscarriage of justice."  (Emphasis sic; citation omitted.)  *Rogers* at ¶ 23.

### 1.  Improper Statements in Voir Dire and Opening Statement

{¶ 33}  Appellant contends the prosecutor improperly branded both Ms. Hager and appellant as "pirates" throughout voir dire and "partner[s] in crime" once during opening statements, thus portraying appellant as a criminal not entitled to the presumption of innocence.  (Appellant's Brief at 8, 9.)  Appellant also contends the prosecutor within this exchange implied appellant either killed or intimidated potential witnesses.

{¶ 34}  The relevant exchange during voir dire occurred when the prosecutor asked a prospective juror to describe a pirate, then stated "[d]oes anyone here like pirates? They're criminals on the high seas, right?"  (Voir Dire Tr. at 74.)  The prosecutor then asked the juror how he would prosecute the pirates, for example "Blackbeard," given pirates leave no physical evidence or witnesses behind.  (Voir Dire Tr. at 75.)  The prosecutor agreed with the juror's answer that they would call other pirates as witnesses, stating "[c]all the other pirates, right?  That is all we have left, right?  Does that make sense to everybody?  The pirates got rid of all of the other witnesses.  All we can do is turn some of the pirates against the other pirate.  Right?"  (Voir Dire Tr. at 75.)

{¶ 35}  As an example, the prosecutor asked the juror whether he thought "Bluebeard," who "agree[d] to work with us and prosecute Blackbeard, who is the captain on the ship," would want "something in exchange for testifying against Blackbeard," and whether it would bother the juror if Bluebeard got a deal or whether the juror would still listen to Bluebeard.  (Voir Dire Tr. at 75-76.)  The prosecutor then asked the whole group whether anybody was not "going to be willing to listen to a pirate, period" or whether they would "give them a fair shake."  (Voir Dire Tr. at 78.)  Later, during the state's opening statement at trial, the prosecutor told the jury:

> [Y]ou are going to meet Chiquetta Hager.  She is our pirate.
> And we are going to be honest with you about her.  She got a
> deal.  We made that deal with Chiquetta, hundred percent.
> But she did take ownership of what she did, and she will be
> punished for what she did, but she did get a deal.

* * *

Chiquetta is the mother of [appellant's] children.  She was his partner in crime.  She was with him since she was 17.  They were together a long time. * * * [S]he was there, she was with him.

She is our pirate.  Again, I ask that you listen to her with an open mind.

(Tr. Vol. 1 at 36-37.)

{¶ 36} Appellant has not provided legal authority specific to prosecutorial misconduct during voir dire generally or the impropriety of a prosecutor stating its key witness and the defendant were partners in crime, or using a similar analogy, when pursuing a guilty verdict by way of complicity.  Nevertheless, we disagree with appellant that the statements "eviscerated the presumption of innocence" or otherwise rendered appellant's trial unfair warranting reversal on the facts of this case.  (Appellant's Brief at 5.)

{¶ 37} Within the full context of the voir dire transcript, the prosecutor made it clear that the state pursued a theory of the case in which defendant was guilty as an aider and abettor as part of a larger group and was attempting to see whether any potential juror would "automatically discount" a witness because he or she was involved in the crime or received a plea deal.  (Voir Dire Tr. at 79.)  Likewise, during the opening statement and at trial, the jurors were made aware the state pursued a theory of guilt by way of complicity in which appellant admittingly did not pull the trigger of the gun but aided and abetted those who did.  The trial court specifically instructed the jury that opening statements are "not evidence, but * * * a road map in order for both parties to provide you with what they believe the evidence is going to show throughout the trial."  (Tr. Vol. 1 at 34.)  Throughout the trial, the state presented evidence in support of the aider and abettor theory.  Furthermore, we do not find the prosecutor's reference to pirates getting rid of witnesses, within the context of the voir dire questioning and considering the full record, rendered appellant's trial unfair.

{¶ 38} In other words, the context of the statements shows the prosecutor's comments presented the jury a theory it would attempt to prove, rather than a statement as to appellant's criminality that destroyed his presumption of innocence, as contended by appellant.  On this record, we find appellant has not demonstrated plain error in regard to

the prosecutor's pirate analogy and "partner[s] in crime" reference.  (Appellant's Brief at 8.)

### 2.  Failure to Correct A Material Falsehood

{¶ 39} Appellant contends Ms. Hager testified at trial that "she would have to serve eight years, and that her sentence would not be subject to reduction through judicial release," and the prosecutor was aware this was a false statement and had a duty to correct it.  (Appellant's Brief at 9.)  Specifically, appellant argues the state was aware Ms. Hager pleaded guilty to abduction and involuntary manslaughter, neither of which, according to appellant, involved mandatory prison time.  In appellant's view, given Ms. Hager was sentenced to eight years, she could apply for release after five years under R.C. 2929.20(C)(4),[4] which given her time served, Ms. Hager could theoretically apply for release approximately two years after her testimony.

{¶ 40} "The knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  (Citation omitted.)  *State v. Iacona*, 93 Ohio St.3d 83, 97 (2001).  "Such a claim is in the nature of an allegation of prosecutorial misconduct, and the burden is on the defendant to show that (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false."  (Internal quotation omitted.)  *Id.*

{¶ 41} Here, a pretrial hearing shows the state recognized that a co-defendant, presumably Ms. Hager, received a plea deal whereby she pled guilty to "abduction and involuntary manslaughter and is receiving a [joint] recommendation of eight years." (May 31, 2017 Tr. at 12.)  During direct questioning by the prosecutor at trial, Ms. Hager said she agreed to a plea deal requiring her to "testify and do the eight years" of prison after pleading guilty to abduction and manslaughter.  (Tr. Vol. 2 at 262, 265.)  The prosecutor followed up by asking "you have not been sentenced yet, but the agreement is that you are going to get eight years in prison," and Ms. Hager replied in the affirmative.  (Tr. Vol. 2 at

---

[4] R.C. 2929.20(C)(4) states "[i]f the aggregated nonmandatory prison term or terms is more than five years but not more than ten years, the eligible offender may file the motion not earlier than the date on which the eligible offender has served five years of the offender's stated prison term or, if the prison term includes a mandatory prison term or terms, not earlier than five years after the expiration of all mandatory prison terms." We note that under R.C. 2929.14(A)(1)(b), "[f]or a felony of the first degree committed prior to [March 22, 2019], the prison term shall be a definite prison term of three, four, five, six, seven, eight, nine, ten, or eleven years."  *See also* R.C. 2929.01(X) (defining mandatory prison term to include terms imposed under R.C. 2929.14(B)).

263.)  The prosecutor discussed with Ms. Hager, and offered into evidence, the proffer letter, plea agreement, and guilty plea, which is dated November 3, 2015.  The guilty plea form shows Ms. Hager's plea of guilty to abduction, a third-degree felony, and involuntary manslaughter, a first-degree felony, and marks only the sentence imposed for the involuntary manslaughter charge (which, per the joint recommendation, is five years) as a "mandatory prison term."  (Entry of Guilty Plea at 1.)  Ms. Hager then agreed with the prosecutor that part of her motive for cooperating was that she "will get out after [her] eight years, [she] will get to see [her] children [after that]."  (Tr. at 266.)

{¶ 42}  The statement appellant contends is materially false then occurred during cross-examination of Ms. Hager by appellant's counsel:

> Q.  Okay.  And did you sign something called a proffer letter?
>
> A.  Yes.
>
> Q.  Okay.  What is your understanding exactly of what a proffer letter is?
>
> A.  An agreement to a plea.
>
> Q.  And what is the agreement?
>
> A.  To testify in exchange for a certain amount of time.
>
> Q.  And what was that amount of time?
>
> A.  Eight years.
>
> Q.  All right.  You remember that.  Do you remember whether that was flat time or whether it was time credited for the part you had already done?
>
> A.  Flat time.  But they said that for the time that I have been incarcerated would count.
>
> Q.  Okay.  And did they ever talk to you about judicial release?
>
> A.  No.
>
> Q.  Do you know about judicial release?
>
> A.  I know what it is, but I don't qualify for it.  It wasn't an option for me.
>
> Q.  Why not?
>
> A.  It just was never brought up.
>
> Q.  So you don't know whether you qualify or not?
>
> A.  Well, I asked my attorney whether there was a way I would get out earlier, and he said no.

Q. But you did believe you are getting credit for the time you served?

A. Yes.

(Tr. Vol. 2 at 345-47.) Later, in rebuttal on closing arguments, the prosecutor stated "[y]ou know [Ms. Hager] has a motive to tell the truth. She got a deal. * * * She gets her eight years, she is out and gets to see her kids. It is a pretty good motive to tell the truth." (Tr. Vol. 3 at 584.)

{¶ 43} Based on this record, even assuming, arguendo, that not all of Ms. Hager's eight-year sentence is mandatory, contrary to appellant's argument we do not consider the cited testimony to be a material falsehood. First, the cited statement is not plainly a false statement. Ms. Hager's testimony arguably encompasses her personal belief that she did not qualify for judicial release based on her conversations with her attorney. *See Iacona* at 97 (finding no prosecutorial misconduct where the witness gave an answer *as far as he knew*, which was "by its own terms, limited to his own personal knowledge"). Second, Ms. Hager testified she was motivated to tell the truth at least in part by her desire to complete her sentence and get out of jail, and we fail to see how the state's not clarifying her ability to potentially get out of jail sooner materially affected this proceeding on this record. Third, the jury had available for reference, as an admitted exhibit, Ms. Hager's guilty plea form that shows the particulars of Ms. Hager's sentence. Thus, even if the prosecutor had a duty to clarify Ms. Hager's statement on judicial release, we cannot say the failure to do affected appellant's substantial rights. Considering all the above, we find appellant has not demonstrated plain error in regard to the prosecutor failing to correct Ms. Hager's statement on judicial release.

### 3. Vouching for Key Witness

{¶ 44} Appellant argues the prosecutor improperly vouched for its primary witness, Ms. Hager, during closing argument, and the jury may have believed the prosecutor was basing her statements either on evidence outside of the record or her years of experience. According to appellant, there is "no reason to believe that the jury did *not* consider that information when making its credibility determination regarding Ms. Hager's testimony." (Emphasis sic.) (Appellant's Brief at 11.)

{¶ 45} Prosecutors are afforded considerable latitude in closing arguments. *State v. Dillon*, 10th Dist. No. 04AP-1211, 2005-Ohio-4124, ¶ 50, citing *State v. Ballew*, 76 Ohio

St.3d 244, 255 (1996). A prosecutor's isolated comments are not to be taken out of context and given their most damaging meaning. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 94, citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974). Rather, an appellate court must review a closing argument in its entirety to determine whether prejudicial error occurred. *Noling* at ¶ 94, citing *State v. Frazier*, 73 Ohio St.3d 323, 342 (1995). Moreover, "[i]n closing argument, a prosecutor may comment on ' "what the evidence has shown and what reasonable inferences may be drawn therefrom." ' " *Dillon* at ¶ 50, quoting *State v. Lott*, 51 Ohio St.3d 160, 165 (1990), quoting *State v. Stephens*, 24 Ohio St.2d 76, 82 (1970).

{¶ 46} However, "[i]t is improper for an attorney to express his or her personal belief or opinion as to the credibility of a witness." *State v. Williams*, 79 Ohio St.3d 1, 12 (1997). Conversely, a prosecutor may comment on the testimony and suggest the conclusions to be drawn from it. *State v. Crossty*, 12th Dist. No. CA2008-03-070, 2009-Ohio-2800, ¶ 45; *State v. Oteng*, 10th Dist. No. 14AP-466, 2015-Ohio-1231, ¶ 83. In doing so, the prosecutor may express his or her personal opinion if he bases that opinion on the evidence presented in court. *State v. Shine-Johnson*, 10th Dist. No. 17AP-194, 2018-Ohio-3347, ¶ 88, citing *State v. Belmonte*, 10th Dist. No. 10AP-373, 2011-Ohio-1334, ¶ 31; *State v. Keenan*, 66 Ohio St.3d 402, 408 (1993). Relatedly, improper " '[v]ouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue.' " *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 200, quoting *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, ¶ 232.

{¶ 47} Appellant specifically argues the prosecutor improperly vouched for the credibility of Ms. Hager when she told the jury "[s]he didn't lie. * * * She never lied. * * * She is believable," and "[s]he told you the truth of what she knew." (Tr. Vol. 3 at 578, 584, 587.) Within the larger context of these cited passages, the prosecutor states:

> Chiquetta Hager took four times to give up [appellant]. That is credible. That makes sense. You heard about their relationship. You heard about their history. You saw the matching tattoos. Okay? It took her a while. And you heard about her statements and you heard from her and the detective. *She didn't lie.* She just was reluctant to give him up. *She never lied.* She just kind of omitted his involvement.
>
> * * *
>
> She was in a good place with him. She has no reason to lie against him. If she had some deep, dark motive against him,

> she would have made it worse.  She would have said:  Yeah, I sat at that table and I heard every word he said; or, yeah, he was the one with the gun who shot him in the car.
>
> *She told you the truth of what she knew.*  She told you she didn't want to tell us because she was trying to protect him. You saw her testimony.  You saw her demeanor.  You know it was visibly hard for her to come in here and do this.
>
> * * *
>
> Now, Ms. Van Culin went over the instructions, so I don't want to go over it in too much detail, but I want to highlight what is important for you to consider.  Okay? * * *
>
> One witness if believed by you is sufficient to prove any fact. We talked about it in voir dire.  You all said you were okay with that.  She is our pirate.  She is our witness.  *She is believable.* She tells you what he did.  Okay?

(Emphasis added.)  (Tr. Vol. 3 at 578, 584, 587.)

{¶ 48}  In *Thompson*, the Supreme Court of Ohio determined the prosecutor did not vouch for the credibility of a witness where the comment was essentially an argument "that no evidence on the record undermined [the witness's] truthfulness."  *Id.* at ¶ 200. Furthermore, as previously stated, even if the prosecutor expresses a personal opinion on the truthfulness of a witness, reversable error does not automatically result where the trial was nonetheless fair or where plain error is not demonstrated by the appellant.  *Wilkerson*, 2002-Ohio-5416.

{¶ 49}  For example, in *State v. Kiser*, 4th Dist. No. 15CA25, 2016-Ohio-5307, ¶ 31, the Fourth District Court of Appeals found the prosecutor's statement during closing argument, "[the victim] I think has come up, testified to you very honestly at what she saw and what she didn't, there's no reason to doubt her testimony here," to not rise to the level of prosecutorial misconduct meriting a new trial under plain error standard review within context of the entire trial.  *See also State v. Alfieri*, 132 Ohio App.3d 69, 84-85 (3d.Dist.1998) (finding that although prosecutor's act of personally vouching for the credibility of the state's witness constituted misconduct, in the context of the full closing argument and trial, the defendant was not deprived of a fair trial).

{¶ 50}  Here, within a larger context, the prosecutor's statements "[s]he didn't lie. * * * She never lied" related to Ms. Hager's prior testimony attempting to explain her evolving story to police and her initial holding back of appellant's presence and

involvement. (Tr. Vol. 3 at 578.) The prosecutor's statement "[s]he told you the truth of what she knew" refers back to Ms. Hager's testimony that she was in and out of the kitchen when the discussion to deal with Mr. Elmore took place. (Tr. Vol. 3 at 584.) Finally, the prosecutor's statement "[s]he is believable" specifically recalled the jury instruction on sufficiency of the evidence based on one witness, if believed. (Tr. Vol. 3 at 587.) Furthermore, the jury was instructed:

> You are the sole judges of the facts, the credibility of the witnesses and the weight of the evidence. * * * You will apply the tests of truthfulness which you apply in your daily lives.
>
> These tests include the appearance of each witness upon the stand; the witness' manner of testifying; the reasonableness of the testimony; the opportunity the witness had to see, hear and know the things concerning the testimony; the accuracy of the witness' memory; frankness or lack of it; intelligence, interest and bias, if any, together with all of the facts and circumstances surrounding the testimony. Applying these tests you will assign to the testimony of each witness such weight as you deem proper.
>
> * * *
>
> * * * It is your province to determine what testimony is worthy of belief and what testimony is not worthy of belief.

(Tr. Vol. 3 at 531-32.) The jury was also instructed to weigh the testimony of an accomplice "with grave caution" and that "[i]t is for you, as jurors, in the light of all of the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth." (Tr. Vol. 3 at 535.) "We presume that the jury followed the court's instructions." *Thompson*, 2014-Ohio-4751, at ¶ 192; *Shine-Johnson*, 2018-Ohio-3347, at ¶ 91-92. We further note that the defense at least in part argued its case based on the credibility of Ms. Hager, particularly her statements concerning her and appellant's alleged lack of awareness that Mr. Elmore would be shot. Considering all the above, we find appellant has not demonstrated plain error in regard to the prosecutor improperly vouching for a witness.

{¶ 51} Overall, based on a review of the record and considering the complained of statements within the context of the entire trial, we cannot conclude that the prosecutor's statements, in isolation or cumulatively, when reviewed under the plain error standard, rose to the level of prosecutorial misconduct meriting a new trial.

{¶ 52} Accordingly, we overrule appellant's first assignment of error.

**B. Appellant's Second Assignment of Error**

{¶ 53} In his second assignment of error, appellant contends the trial court erred in denying appellant's Crim.R. 29 motion for acquittal for murder under R.C. 2903.02(A) and violated his rights to due process and a fair trial when, in the absence of sufficient evidence, it convicted him on Count 1 of the indictment. For the following reasons, we disagree with appellant.

{¶ 54} Crim.R. 29(A) provides: "The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." "Because a Crim.R. 29 motion questions the sufficiency of the evidence, '[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence.' " *State v. Brown*, 10th Dist. No. 15AP-935, 2016-Ohio-7944, ¶ 27, quoting *State v. Hernandez*, 10th Dist. No. 09AP-125, 2009-Ohio-5128, ¶ 6; *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37. Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 15, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law, not fact. *Kurtz* at ¶ 15. "In determining whether the evidence is legally sufficient to support a conviction, ' "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." ' " *Id.*, quoting *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact." *State v. Patterson*, 10th Dist. No. 15AP-1117, 2016-Ohio-7130, ¶ 32, citing *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 55} "In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction." *Kurtz* at ¶ 16, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-

Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). "Further, 'the testimony of one witness, if believed by the jury, is enough to support a conviction.' " *Patterson* at ¶ 33, quoting *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42. *See also State v. Clark*, 10th Dist. No. 15AP-926, 2016-Ohio-5493, ¶ 25.

{¶ 56} R.C. 2903.02(A) states, in pertinent part, "[n]o person shall purposely cause the death of another." At trial, the state argued appellant was guilty of purposeful murder under R.C. 2903.02(A) under the theory of complicity. R.C. 2923.03(A) defines the offense of complicity, in relevant part, as follows:

> No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
> * * *
> (2) Aid or abet another in committing the offense.

"[T]o support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *State v. Johnson*, 93 Ohio St.3d 240, 245-46 (2001) " '[T]he mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' " *Id.* at 243, quoting *State v. Widner*, 69 Ohio St.2d 267, 269 (1982). Aiding and abetting may be shown by both direct and circumstantial evidence, and participation may be inferred from presence, companionship, and conduct before and after the offense is committed. *Johnson* at 245.

{¶ 57} Appellant argues the record of the case is devoid of any evidence that appellant's purpose was to kill Mr. Elmore. At best, appellant believes the state's evidence established that Mr. Elmore's killing was a purposeful act by Granger and Brady, but no evidence showed that Granger and Brady formed that mental state before Mr. Elmore started to get into the van, and no evidence showed that appellant was aware of their purpose at any time or shared that purpose. To the contrary, appellant points out Ms.

Hager testified "she 'didn't think they were going to kill [Mr. Elmore].' " (Appellant's Reply Brief at 6.)

{¶ 58} Appellant further argues a question by the jury during deliberations demonstrates no evidence showed appellant had knowledge that Granger and Brady intended to kill Mr. Elmore. As previously provided, the jury question stated "[i]f the outcome of the evening of May 31st changed the original intent, if the defendant had no knowledge (but he had knowledge of original intent), can [appellant] be found [guilty of murder for] 'failing to act?' " (Tr. Vol. 3 at 600.) According to appellant, this question indicates the jurors believed the original intent was "merely to deceive Mr. Elmore into a conversation about the May 29, 2015 robbery, and possibly cause physical harm to him" and not to kill Mr. Elmore, and appellant could nonetheless be convicted of murder for "failing to act" to stop Granger and Brady. (Appellant's Brief at 15.) Appellant notes that the idea that appellant had a duty to act presumably arose from the jury instruction regarding causation, which was not tailored to the evidence and should not have been given to the jury.

{¶ 59} The state argues, based on the evidence presented, the charge of purposeful murder on a theory of complicity is supported by sufficient evidence. Specifically, the state contends appellant's intent to kill Mr. Elmore can be inferred from circumstances surrounding the shooting and appellant's subsequent conduct. The state argues the jury question is irrelevant to the question of sufficiency but notes there is no reason to believe this view represented the ultimate view of the entire jury. Alternatively, the state argues that even if there is a lack of sufficient evidence as to Count 1 (purposeful murder), this would be harmless considering appellant was convicted of the same offense on an alternative basis in Count 2 (felony murder).

{¶ 60} In this case, it is undisputed that appellant did not fire the shot that killed Mr. Elmore, and the issue presented on appeal centers on whether appellant shared the criminal intent of the principal offenders. The criminal intent necessary to convict a defendant of murder under R.C. 2903.02(A) is "purposely." "A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that

nature."  R.C. 2901.22(A).  "It is a fundamental principle that a person is presumed to intend the natural, reasonable and probable consequences of his voluntary acts."  *State v. Johnson*, 56 Ohio St.2d 35, 39 (1978).  "Purpose or intent can be established by circumstantial evidence * * * and by the surrounding facts and circumstances in the case." *State ex rel. Brust v. Mohr*, 10th Dist. No. 17AP-275, 2018-Ohio-1067, ¶ 12.

{¶ 61}  In this case, the state presented evidence that appellant was the victim of the violent home invasion robbery orchestrated in part by Mr. Elmore, provided all the information regarding the robbery and Mr. Elmore's involvement to the group, was present during the group's discussion of Mr. Elmore, provided one of the guns used by the shooters, rode in the van with the group to the scene of the crime, fled the scene of the crime with the group, failed to alert law enforcement of the shooting, engaged in multiple acts in an attempt to cover up the crime, hid for one week after the crime, and initially lied to law enforcement regarding being in the van when the shooting occurred.

{¶ 62}  This court has previously held the defendant's relationship with the victim, fleeing the scene of the crime with the principal offender, failing to report the crime, and assisting in attempting to cover up the crime serve as evidence the defendant shared the principal offender's purpose to kill the victim.  *State v. Dortch*, 10th Dist. No. 12AP-125, 2012-Ohio-6196, ¶ 30-33, *appeal not allowed*, 135 Ohio St.3d 1434,  2013-Ohio-1857 (finding evidence that defendant fled the scene of the crime with the principal offender, discussed the shooting on his cell phone and changed clothes immediately after the shooting, and did not report the shooting to police to support conviction for murder under R.C. 2903.02(A) under a complicity theory); *State v. Hayes*, 10th Dist. No. 14AP-2, 2014-Ohio-5295, ¶ 18, *appeal not allowed*, 142 Ohio St.3d 1518, 2015-Ohio-2341 (disagreeing with defendant's argument that he was merely present when a robbery accomplice shot a victim where the defendant had cooperated with the accomplice in planning the robbery, was present when his companions pointed the gun at the victim during the course of the robbery, and the appellant fled the scene with the shooter and other accomplices); *State v. Horton*, 10th Dist. No. 03AP-665, 2005-Ohio-458, ¶ 33 (citing to evidence that defendant assisted in disposing of accomplice's clothing the day after the victim was killed in support of defendant's shared criminal intent to murder the victim).

{¶ 63} Furthermore, given that a gun is an "inherently dangerous instrumentality, the use of which is reasonably likely to produce death," the Supreme Court and this court have found a defendant's knowledge that a gun will be used to commit a crime, or the defendant's assistance in providing a gun to commit a crime, to be evidence that the defendant shared the principal offender's intent to commit murder. *Widner*, 69 Ohio St.2d at 270 (finding a jury could reasonably infer that defendant formed the specific intention to commit murder and aided a car passenger in the commission of attempted murder where record evidence showed the defendant knew that the passenger was in possession of a gun and, after the passenger fired at a police officer, took intentional evasive actions); *State v. Hall*, 10th Dist. No. 08AP-939, 2009-Ohio-2277, ¶ 27 (finding, although the original plan was to not kill the victim, evidence that the defendant helped plan a robbery, drove the car to the scene, knew an accomplice was going to use a firearm to rob an armed man, and fled the scene with the accomplices was sufficient to support the murder conviction under a complicity theory); *State v. Mitchell*, 10th Dist. No. 10AP-756, 2011-Ohio-3818, ¶ 29 (finding the jury could reasonably infer the defendant's purpose to kill from the fact that he gave his accomplice a gun during the execution of the plan to steal from the victim and his flight from the scene and disposal of the guns after the shooting "demonstrate[d] furtive conduct reflective of a consciousness of guilt"); *State v. Horton*, 10th Dist. No. 13AP-855, 2014-Ohio-2785, ¶ 14 (evidence that the defendant retrieved a gun from his mother's house prior to travelling to the victim's house, "if believed, demonstrated that, if appellant was not the principal offender, he aided and abetted his brother in the commission of the crime"). *See also Brust*, 2018-Ohio-1067, at ¶ 12 ("The specific intent to kill may be reasonably inferred from the fact that a firearm is an inherently dangerous instrument, the use of which is likely to produce death.").

{¶ 64} Moreover, appellant's citation to the transcript where Ms. Hager confirms they "[d]idn't think they were going to kill [Mr. Elmore]" does not render the evidence presented by the state insufficient in this case. (Tr. Vol. 2 at 374.) First, "[i]ntent cannot be proven by the direct testimony of a third person; rather, it can be inferred from the surrounding facts and circumstances of the crime." *State v. Maynard*, 10th Dist. No. 11AP-697, 2012-Ohio-2946, ¶ 28. Second, even if Hager's testimony is believed, this testimony reflects her assessment of the intent of the group at the house when she heard a discussion

of abducting Mr. Elmore, bringing him back to the house, and inflicting pain on him. However, Ms. Hager admitted she did not hear the entire conversation and, in particular, did not know Brady had appellant's gun until appellant told her so after the shooting. Third, to the extent Ms. Hager's testimony can be viewed as conflicting with the circumstantial evidence presented by the state, the resolution of such conflict is within the sole province of the trier of fact and, as such, is not a question of law appropriate for resolution under a sufficiency analysis. *Hall* at ¶ 25.

{¶ 65} Overall, we find the record evidence of this case, construed in the state's favor, shows appellant's involvement in Mr. Elmore's murder extended well beyond his "mere presence" during the shooting. *Johnson*, 93 Ohio St.3d at 243. After viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of purposeful murder proven beyond a reasonable doubt under a complicity theory.

{¶ 66} Finally, appellant has not explained how the question from the jury or the instruction on causation support reversal under a review of the sufficiency of the evidence where, as is the case here, appellant's conviction for murder under R.C. 2903.02(A) is supported by legally sufficient evidence under a complicity theory under R.C. 2923.03(A)(2). Therefore, we find appellant has not demonstrated reversable error regarding the sufficiency of the evidence in light of jury question and instruction on causation. *State v. Sims*, 10th Dist. No. 14AP-1025, 2016-Ohio-4763, ¶ 11 (stating general rule that an appellant bears the burden of affirmatively demonstrating error on appeal); *State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, ¶ 34 ("An appellant must support their assignments of error with an argument, which includes citation to legal authority."), citing App.R. 16(A)(7) and 12(A)(2); *State v. Smith*, 9th Dist. No. 15AP0001n, 2017-Ohio-359, ¶ 22 (noting that it is not the duty of an appellate court to create an argument on an appellant's behalf).

{¶ 67} Accordingly, we overrule appellant's second assignment of error.

### C. Appellant's Third Assignment of Error

{¶ 68} In his third assignment of error, appellant contends his kidnapping conviction was against the manifest weight of the evidence. For the following reasons, we disagree.

{¶ 69} "Even though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence." *State v. McCombs*, 10th Dist. No. 15AP-245, 2015-Ohio-3848, ¶ 3, citing *Thompkins*, 78 Ohio St.3d at 387. "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38.

{¶ 70} "When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Patterson*, 2016-Ohio-7130, at ¶ 34, citing *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

{¶ 71} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *discretionary appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

{¶ 72} Appellant was found guilty of committing kidnapping, in violation of R.C. 2905.01(A), which states in pertinent part:

No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(2) To facilitate the commission of any felony[5] or flight thereafter;

(3) To terrorize, or to inflict serious physical harm on the victim or another.

A defendant may be found guilty of kidnapping if the defendant acted in complicity with the principal offenders as an aider and abetter under R.C. 2923.03(A)(2). *See Horton*, 2005-Ohio-458, at ¶ 26-28. Under this theory, the revised code proscribes that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(A)(2). "[T]o support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *Johnson*, 93 Ohio St.3d at 245-46. " '[T]he mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' " *Id.* at 243, quoting *Widner*, 69 Ohio St.2d at 269. Aiding and abetting may be shown by both direct and circumstantial evidence, and participation may be inferred from presence, companionship, and conduct before and after the offense is committed. *Johnson* at 245.

{¶ 73} In this appeal, appellant challenges the second part of R.C. 2905.01(A): the lack of evidence of appellant's purpose under either R.C. 2905.01(A)(2) or (3). Specifically, appellant argues that "a reasonable factfinder could not conclude beyond a reasonable doubt that even if [appellant] was aware that Mr. Elmore was going to be expected to answer questions about the robbery that occurred two days prior, he would have also believed that harm would necessarily befall Mr. Elmore as a result of that questioning." (Appellant's Brief at 18.) Appellant argues that "Ms. Hager did not believe that Mr. Elmore would be harmed, thus it is unreasonable to conclude that [appellant] believed so, or

---

[5] Per the November 6, 2015 indictment: "[T]o wit: Felonious Assault and/or Murder."

believed that a felony was being facilitated by having Mr. Elmore come to the van." (Appellant's Brief at 18.)  Appellant cites to the following excerpt of Ms. Hager's testimony:

> Q.  Did you think something bad was going to happen?
>
> A.  Um, I kind of know how [Mr. Elmore] is, and he is one of those type of people that would have just been up front with the situation, like, once you sit down and talk to him.  So in my head I though it want's going to be taken to that extent because I know him.

 (Tr. Vol. 2 at 307.)

{¶ 74}  Here, the state presented evidence that appellant was present during the group's discussion of Mr. Elmore, in which they brought up taking Mr. Elmore back to the basement and physically harming him and supplied one of the guns to be used in encountering Mr. Elmore.  Appellant also rode in the van with the group to the scene of the crime, fled the scene of the crime with the group, failed to alert law enforcement of the shooting, engaged in multiple acts in an attempt to cover up the crime, hid for a week after the crime, and initially lied to law enforcement regarding being in the van when the shooting occurred.  On this record, a reasonable factfinder could conclude beyond a reasonable doubt that appellant believed Mr. Elmore would be seriously harmed or that a felony would be facilitated by having Ms. Hager have Mr. Elmore exit his home and enter the van where the armed group waited.  Appellant's argument to the contrary lacks merit.

{¶ 75}  Having reviewed the entire record, we cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that appellant's kidnapping conviction must be reversed.  Therefore, appellant's kidnapping conviction is not against the manifest weight of the evidence.

{¶ 76}  Accordingly, we overrule appellant's third assignment of error.

**D.  Appellant's Fourth Assignment of Error**

{¶ 77}  In his fourth assignment of error, appellant contends his murder convictions under R.C. 2903.02(A) and (B) were against the manifest weight of the evidence.  For the following reasons, we disagree with appellant.

{¶ 78}  "Even though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence."  *McCombs*, 2015-Ohio-3848, ¶ 3, citing *Thompkins*, 78 Ohio St.3d at 387.  "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict

as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *Cassell*, 2010-Ohio-1881, at ¶ 38.

{¶ 79} "When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Patterson*, 2016-Ohio-7130, at ¶ 34, citing *Thompkins*, 78 Ohio St. at 387, citing *Martin*, 20 Ohio App.3d at 175. An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

{¶ 80} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *Cattledge*, 2010-Ohio-4953, at ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co.*, 10 Ohio St.3d at 80. "Accordingly, we afford great deference to the jury's determination of witness credibility." *Albert*, 2015-Ohio-249, at ¶ 14. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *Harris*, 2014-Ohio-2501, at ¶ 25, *discretionary appeal not allowed*, 2014-Ohio-4414, citing *G.G.*, 2012-Ohio-5902, at ¶ 7.

{¶ 81} Appellant was found guilty of committing both purposeful murder under R.C. 2903.02(A) and felony murder under R.C. 2903.02(B). R.C. 2903.02(A) states, in pertinent part, "[n]o person shall purposely cause the death of another." R.C. 2903.02(B) states, in pertinent part, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."[6]

---

[6] Per the November 6, 2015 indictment: "[T]o wit: kidnapping."

{¶ 82} A defendant may be found guilty of murder if the defendant acted in complicity with the principal offenders as an aider and abetter under R.C. 2923.03(A)(2). *See Dortch*, 2012-Ohio-6196, at ¶ 30; *Maynard*, 2012-Ohio-2946, at ¶ 28-34. Under this theory, R.C. 2923.03(A)(2) proscribes that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." "[T]o support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *Johnson*, 93 Ohio St.3d at 245-46. " '[T]he mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' " *Id.* at 243, quoting *Widner*, 69 Ohio St.2d at 269. Aiding and abetting may be shown by both direct and circumstantial evidence, and participation may be inferred from presence, companionship, and conduct before and after the offense is committed. *Johnson* at 245.

{¶ 83} Regarding purposeful murder under R.C. 2903.02(A), appellant argues that, as shown in the second assignment of error, the lack of sufficient evidence necessarily means the weight of the evidence cannot be in favor of conviction, and the jury lost its way in convicting appellant on Count 1 of the indictment.

{¶ 84} Contrary to appellant's argument, in the second assignment of error, we found the record evidence of this case showed appellant's involvement in Mr. Elmore's murder extended well beyond his "mere presence" during the shooting. *Id.* at 243. Appellant was the victim of the violent home invasion robbery orchestrated in part by Mr. Elmore, provided all the information regarding the robbery and Mr. Elmore's involvement to the group and was present during the group's discussion of Mr. Elmore, provided the gun used by one of the shooters, rode in the van with the group to the scene of the crime, fled the scene of the crime with the group, failed to alert law enforcement of the shooting, engaged in multiple acts in an attempt to cover up the crime, hid for one week after the crime, and initially lied to law enforcement regarding being in the van when the shooting occurred. Therefore, we found sufficient evidence supported appellant's conviction for purposeful murder. Because appellant bases his manifest weight argument regarding purposeful murder on the absence of evidence of a shared purpose to kill Mr. Elmore, an

argument we already disposed of in the state's favor in the second assignment of error, we find appellant's argument to likewise lack merit.

{¶ 85} Regarding felony murder under R.C. 2903.02(B), appellant argues that, as shown in the third assignment of error, his kidnapping conviction was against the manifest weight of the evidence. As a result, appellant contends that without the predicate felony, his murder conviction under R.C. 2903.02(B) in Count 2 is against the manifest weight of the evidence.

{¶ 86} In this case, the trial court merged the felony murder offense with the purposeful murder offense and sentenced appellant on the purposeful murder offense. We have already found appellant's conviction for purposeful murder under R.C. 2903.02(A) to be based on sufficient evidence and is not against the manifest weight of the evidence. In such circumstances, an " 'appellate court need not consider the sufficiency [or weight] of the evidence on the count that is subject to merger because any error would be harmless' beyond a reasonable doubt." *State v. Sheldon*, 3d Dist. No. 6-18-07, 2019-Ohio-4123, ¶ 11, quoting *State v. Ramos*, 8th Dist. No. 103596, 2016-Ohio-7685, ¶ 14. *See State v. Lammkin*, 10th Dist. No. 18AP-398, 2019-Ohio-682, ¶ 15, fn. 1 ("Because the murder count merged with the aggravated murder count at sentencing, we need not address [appellant's] manifest weight challenge to the murder count."); *State v. Washington*, 10th Dist. No. 09AP-424, 2009-Ohio-6665, ¶ 18 (noting an appellate court is "not required" to address a challenge to a merged offense), citing *State v. Smith*, 10th Dist. No. 08AP-736, 2009-Ohio-2166, ¶ 27; *State v. McKinney*, 10th Dist. No. 08AP-23, 2008-Ohio-6522, ¶ 39; *State v. Worley*, 8th Dist. No. 103105, 2016-Ohio-2722, ¶ 23 (declining to address manifest weight argument for offenses that merged with aggravated murder offense).

{¶ 87} Regardless, appellant's argument here regarding felony murder fails. In the third assignment of error, we found that, contrary to appellant's argument, a reasonable factfinder could conclude beyond a reasonable doubt that the record evidenced appellant's purpose under either R.C. 2905.01(A)(2) or (3). As a result, we did not find his conviction for kidnapping to be against the manifest weight of the evidence. Because appellant bases his manifest weight argument regarding felony murder on an argument we already disposed of in the state's favor in the third assignment of error, we find appellant's argument challenging the jury verdict on the felony murder offense to likewise lack merit.

{¶ 88} Accordingly, we overrule appellant's fourth assignment of error.

**E.  Appellant's Fifth Assignment of Error**

{¶ 89} In his fifth assignment of error, appellant contends the trial court committed plain error when it allowed improper hearsay testimony.  For the following reasons, we disagree with appellant.

{¶ 90} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Evid.R. 801(C).  Unless an exception applies, hearsay is inadmissible.  Evid.R. 802.  *In re McLemore*, 10th Dist. No. 03AP-714, 2004-Ohio-680, ¶ 8.  "A trial court has broad discretion concerning the admission or exclusion of evidence."  *State v. Hogg*, 10th Dist. No. 11AP-50, 2011-Ohio-6454, ¶ 43.  An appellate court will generally not second guess a trial court's determination on the admission or exclusion of evidence in the absence of an abuse of such discretion.  *Id.*  In this case, however, appellant concedes the plain error standard of review applies due to the lack of a contemporaneous objection at trial to the challenged statements.

{¶ 91} We will exercise our discretion and proceed to address appellant's hearsay argument under the plain error standard of review.  A court will find plain error only when (1) there was an error, (2) the error was "plain," i.e., obvious, and (3) the error "affected substantial rights."  *Tench*, 2018-Ohio-5205, at ¶ 217, citing *Barnes*, 94 Ohio St.3d at 27.  *Rogers*, 2015-Ohio-2459, at ¶ 22 (specifying third prong employs "the same deferential standard for reviewing ineffective assistance of counsel claims").  "[T]he accused bears the burden of proof to demonstrate plain error on the record."  *Id.*, citing *Quarterman*, 2014-Ohio-4034, at ¶ 16.  "But even if an accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it; we have admonish[ed] courts to notice plain error with the utmost caution, under exceptional circumstances and *only* to prevent a manifest miscarriage of justice."  (Emphasis sic; citation omitted.)  *Rogers* at ¶ 23.

{¶ 92} According to appellant, it was improper for the trial court to permit one co-defendant (Ms. Hager) to testify about out-of-court statements made by other co-defendants (Mr. Hager and Brady) when the state failed to establish the unavailability of those co-defendants and failed to show corroborating circumstances clearly indicated the

trustworthiness of the statements to permit admission under the Evid.R. 804(B)(3) exception. Appellant specifically cites to the portion of the transcript where the state told Ms. Hager she could "use the words [of Mr. Hager and Brady] if [she] recall[ed]," and Ms. Hager told the jury there was talk of bringing Mr. Elmore "back to the basement" and "inflicting pain." (Tr. Vol. 2 at 285, 286.) Appellant notes the trial court eventually instructed Ms. Hager that she "can't say what other people told [her]" but failed to provide a curative instruction regarding the admitted hearsay statements. (Tr. Vol. 2 at 291.) Appellant contends prejudice resulted, specifically as to his convictions for felony murder and kidnapping, since no other evidentiary source supported the state's contention that when Ms. Hager went to pick up Mr. Elmore at his home, there was a plan to do harm to Mr. Elmore.

{¶ 93} The state counters that appellant's argument fails in two ways. The state asserts the statements were opinion and not offered for the truth of the matter asserted and, as an alternative means to overrule the assignment of error, asserts the hearsay exception under Evid.R. 803(3) applies.

{¶ 94} Evid.R. 803(3) creates a hearsay rule exception for "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design * * *), but not including a statement of memory or belief to prove the fact remembered or believed * * *." "It has long been settled that the state-of-mind exception may be used as the basis for introducing statements showing the forward-looking intent of the declarant for the purpose of proving that he thereafter acted in accordance with that intent." (Citations omitted.) *Yarbrough*, 2002-Ohio-2126, at ¶ 33. *See, e.g., State v. Gervin*, 3d Dist. No. 9-15-52, 2016-Ohio-8399, ¶ 215 (finding Evid.R. 803(3) exception applied where testimony reflected group discussion of a plan to blow up a car to get rid of evidence). Evid.R. 803(3) operates even though "the declarant is available as a witness."

{¶ 95} Having reviewed the transcript, even if for sake of argument the cited statements are hearsay, they would fall squarely within the Evid.R. 803(3) hearsay exception. The statements express the declarants' current intent, plan, motive, and design to take future actions against Mr. Elmore. Therefore, we find the trial court did not commit

plain error in allowing the challenged testimony to be admitted.  As a result, appellant's fifth assignment of error lacks merit.

{¶ 96} Accordingly, we overrule appellant's fifth assignment of error.

### F.  Appellant's Sixth Assignment of Error

{¶ 97} In his sixth assignment of error, appellant contends he was deprived of his constitutional right to the effective assistance of counsel.  For the following reasons, we disagree with appellant.

{¶ 98} To establish a claim of ineffective assistance of counsel, appellant must demonstrate that counsel's performance was deficient and that counsel's deficient performance prejudiced him.  *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 133, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The failure to make either showing defeats a claim of ineffective assistance of counsel.  *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), citing *Strickland* at 697.

{¶ 99} In order to show counsel's performance was deficient, the appellant must prove that his or her counsel's performance fell below an objective standard of reasonable representation.  *Jackson* at ¶ 133.  In other words, counsel made errors " 'so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' "  *State v. Thompson*, 10th Dist. No. 18AP-211, 2019-Ohio-2525, ¶ 13, quoting *Strickland* at 687.  The appellant must overcome the strong presumption that defense counsel's performance falls within a wide range of reasonable professional assistance.  *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101, citing *Strickland* at 689.

{¶ 100} "To show prejudice, the appellant must establish that but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different."  *State v. Jones*, 10th Dist. No. 18AP-33, 2019-Ohio-2134, ¶ 50, citing *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 204.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, ¶ 82, citing *Strickland* at 694.

{¶ 101} Appellant maintains that counsel was ineffective in: (1) not objecting to any of the misconduct identified in the first assignment of error; (2) not objecting to inadmissible hearsay identified in the fifth assignment of error; and (3) not objecting to a "generic 'failure-to-act' jury instruction regarding causation."  (Appellant's Brief at 28.)

### 1. Failure to Object to Prosecutorial Misconduct

{¶ 102} "When a claim of ineffective assistance of counsel is based on counsel's failure to file an objection or file a motion, the appellant must demonstrate that the objection or motion had a reasonable probability of success." *Jones* at ¶ 52. "If the objection or motion would not have been successful, then the appellant cannot prevail on an ineffective assistance claim." *Id.*

{¶ 103} Furthermore, " 'where the failure to object does not constitute plain error, the issue cannot be reversed by claiming ineffective assistance of counsel.' " *State v. Roy*, 10th Dist. No. 14AP-223, 2014-Ohio-4587, ¶ 20, quoting *State v. Carson*, 10th Dist. No. 05AP-13, 2006-Ohio-2440, ¶ 51. *See also Rogers*, 2015-Ohio-2459, at ¶ 22 (stating the plain error review employs the "the same deferential standard for reviewing ineffective assistance of counsel claims").

{¶ 104} Here, appellant imports the same arguments he made under his first assignment of error, which we reviewed under a plain error standard due to the lack of objection at trial to all the alleged instances of prosecutorial misconduct. Having previously held, in addressing appellant's first assignment of error, that appellant did not demonstrate plain error regarding prosecutorial misconduct, we conclude appellant's argument in this regard likewise fails to satisfy the second prong of the *Strickland* test. *Jones* at ¶ 47. Therefore, appellant's argument on counsel's failure to object to the various instances of alleged prosecutorial misconduct lacks merit.

### 2. Failure to Object to Hearsay

{¶ 105} "When a claim of ineffective assistance of counsel is based on counsel's failure to file an objection or file a motion, the appellant must demonstrate that the objection or motion had a reasonable probability of success." *Id.* at ¶ 52. "If the objection or motion would not have been successful, then the appellant cannot prevail on an ineffective assistance claim." *Id.*

{¶ 106} Here, in the fifth assignment of error, we concluded that the statements cited by appellant as hearsay fell within the Evid.R. 803(3) exception. As a result, we cannot find that an objection to the alleged hearsay statements would have had a reasonable probability of success. In other words, counsel was not ineffective in failing to object. *Id.* at ¶ 63. Moreover, having found in the fifth assignment of error that appellant failed to demonstrate

plain error regarding improperly admitted hearsay, we conclude appellant's argument in this regard likewise fails to satisfy the second prong of the *Strickland* test. *Jones* at ¶ 47. Therefore, appellant's argument on counsel's failure to object to hearsay constituting ineffective assistance of counsel lacks merit.

### 3. Failure to Object to "Failure to Act" Jury Instruction

{¶ 107} Appellant argues his counsel's performance was deficient in failing to object to the "generic" jury instruction on causation both when the instruction was presented to the jury and when the jury submitted a question about whether appellant could be convicted of purposeful murder for failing to act. (Appellant's Brief at 28.) Appellant contends these failures led to the likelihood that the jury voted to convict him of purposeful murder because he failed to act to prevent Granger and Brady from shooting Mr. Elmore.

{¶ 108} The jury instructions at issue in this case are as follows:

> The defendant may be convicted as a principal offender or as a complicitor or an aider and abettor to any or all counts and specifications of the indictment. Complicity applies to every count and specification of the indictment.
>
> Before you can find the defendant guilty of a crime or specification as a complicitor or aider and abettor, you must find beyond a reasonable doubt that on or about 31st day of May, 2015, in Franklin County, the defendant solicited or procured another to commit the offense or aided or abetted another in committing the offense with the same knowledge or purpose as required by the offense under consideration.
>
> * * *
>
> * * * An aider or abettor is one who aids, assists, encourages, cooperates with, advises, or incites another to commit a crime, and participates in the commission of the offense by some act, word or gesture.
>
> "Aid" means to help, assist, or strengthen. "Abet" means to encourage, counsel, incite, or assist.
>
> * * *
>
> Count 1. * * * Before you can find the defendant guilty of Murder, you must find that the State has proved beyond a reasonable doubt that on or about the 31st day of May, 2015, in Franklin County, Ohio, the defendant purposely caused the death of Courtney Elmore. * * *
>
> * * *

"Cause" is an act *or failure to act* which in the natural and continuous sequence directly produces the death, and without which it would not have occurred. Cause occurs when the death is the natural and foreseeable result of the act or failure to act.

If a wound is inflicted with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon along with all the other facts and circumstances in evidence.

* * *

The State of Ohio has presented a theory that the defendant acted in complicity with the principal offender or offenders in the commission of the offenses charged. A person who is complicit with another in the commission of a criminal offense is regarded as guilty as if he/she personally performed every act constituting the offense. This is true even if he/she did not personally perform every act constituting the offense or was not physically present at the time the offense was committed. * * *

A defendant may be convicted of an offense, such as murder, either as a principal offender or as a complicitor. Complicity occurs when a person aids or abets another in the commission of an offense. An indictment charging a defendant as a principal offender also charges the defendant with aiding and abetting.

Before you can find a defendant guilty as a complicitor, you must find beyond a reasonable doubt that on or about the 31st day of May, 2015, and in Franklin County, that the defendant aided and abetted another in the commission of the offense of murder.

(Emphasis added.) (Tr. Vol. 3 at 537-41; *see also* Apr. 20, 2018 Jury Instructions at 7-10.) Appellant's trial counsel did not object to the causation instruction. As referenced by appellant, the trial court received the following question from the jury during deliberations: "If the outcome of the evening of May 31st changed the original intent, if the defendant had no knowledge (but he had knowledge of original intent), can [appellant] be found [guilty of murder for] 'failing to act?' " (Tr. Vol. 3 at 600.) The trial court responded by indicating "[c]ause" was defined in the jury instructions under Count 1; defense counsel did not object. (Tr. Vol. 3 at 600.)

{¶ 109} In this case, even if, for sake of argument, defense counsel should have objected to the failure to act instruction or response to the jury question, appellant has not

shown that "but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different" due to record evidence supporting appellant's conviction for murder under complicity as an aider and abettor. *Jones*, 2019-Ohio-2134, at ¶ 50; *Strickland*, 466 U.S. 668.

{¶ 110} "[A] sole instruction must be viewed within context of the whole set [of jury instructions] rather than in isolation." *State v. Huddleston*, 3d Dist. No. 8-17-21, 2018-Ohio-1114, ¶ 29, *appeal not allowed*, 153 Ohio St.3d 1452, 2018-Ohio-2026. *State v. Rutledge*, 10th Dist. No. 17AP-590, 2019-Ohio-3460, ¶ 31. *See Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, ¶ 35 ("An unnecessary, ambiguous, or even affirmatively erroneous portion of a jury charge does not inevitably constitute reversible error.). Furthermore, "we will not speculate as to why the jury asked [a certain] question for purposes of its deliberations." *State v. Ford*, 10th Dist. No. 07AP-803, 2008-Ohio-4373, ¶ 64.

{¶ 111} In *Huddleston*, an appellant convicted of murder argued that he received ineffective assistance of counsel when his trial counsel failed to object to the jury instruction on "causation" because it used untailored, generic language, and his counsel's failure to object prejudiced him because the jury could have found him responsible for murder by virtue of his "failure to act." *Id.* at ¶ 26. The Third District Court of Appeals found the appellant's argument to lack merit since prejudice could not be shown on the record.[7] Specifically, the Third District found that, while the appellant argued he could not be convicted of murder for his failure to act, the record could lead a jury to finding him guilty of murder by way of complicity by aiding and abetting the principal offenders. Thus, even if the jury instruction was problematic, such an error would be harmless beyond a reasonable doubt. The Third District further found the appellant had failed to show how the jury instruction confused the jury or resulted in actual prejudice under the totality of the circumstances presented against him at trial.

---

[7] The Third District also noted the trial court's instruction on causation, including the failure to act language, was taken nearly verbatim from the Ohio Jury Instructions. *See Ohio Jury Instructions*, CR 417.23. In a separate assignment of error challenging the jury instruction directly, the Third District found the appellant had not demonstrated plain error regarding the failure to act language since ample record evidence supported the murder conviction through a complicity theory. *See Huddleston* at ¶ 40-44.

{¶ 112} Similar to *Huddleston*, as provided in detail in the second and fourth assignments of error, the record here could lead a jury to finding him guilty of murder by way of complicity by aiding and abetting the principal offenders. We further note in this case the jury also asked a second question inquiring about specifics of the complicity statute and ultimately returned a verdict of guilty as to murder in Count 1 of the indictment with a finding that appellant "DID" have a firearm on or about his person or under his control while committing the offense, a finding consistent with a finding of guilty by way of complicity as an aider and abettor on this record. (Emphasis sic.) (Apr. 23, 2018 Verdict Form.)

{¶ 113} Considering all the above, we find appellant has not demonstrated that his counsel's performance regarding the failure to act instruction and jury question prejudiced him. *Huddleston* at ¶ 30-31. *See also State v. Sims*, 10th Dist. No. 96APA05-676 (Feb. 20, 1997) (finding in part that even if instruction on complicity was improper, no prejudice resulted where the jury could have found the defendants guilty "whether as principals or as abettors"); *State v. Brown*, 10th Dist. No. 94APA03-298 (Nov. 29, 1994) (finding no prejudicial error in failure to act language in causation instruction when viewed in light of the entire instructions and record evidence supported the guilty verdict); *State v. Overton*, 10th Dist. No. 09AP-858, 2010-Ohio-5256, ¶ 18, *vacated in part on other grounds*, 128 Ohio St.3d 353, 2011-Ohio-740 (finding trial court did not err by refusing to give supplemental and modified jury instructions in response to questions from the jury during their deliberations relating to failure to act language in causation instruction where inclusion of that language was not prejudicial on the record); *State v. Sipos*, 9th Dist. No. 2238 (Aug. 5, 1987) (finding, based on the entire charge given to the jury by the trial court, the totality of the evidence presented by the state and evidence the defendant was the guilty as an "aider and abettor," the defendant was not unduly prejudiced by the inclusion of the failure to act language within the definition of "cause").

{¶ 114} Therefore, appellant's claim of ineffective assistance of counsel in this regard likewise lacks merit. *Bradley*, 42 Ohio St.3d at 143; *Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."). Because appellant cannot satisfy the *Strickland* test

under any of his three alleged instances of ineffective assistance of counsel, his claim of ineffective assistance of counsel fails.

{¶ 115} Accordingly, we overrule appellant's sixth assignment of error.

## IV.  CONCLUSION

{¶ 116} Having overruled appellant's six assignments of error, we affirm the judgments of the Franklin County Court of Common Pleas.

*Judgments affirmed.*

KLATT and LUPER SCHUSTER, JJ., concur.

_____