[Cite as *State v. Sherman*, 2021-Ohio-2894.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## MAHONING COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

MICHAEL SHERMAN,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 20 MA 0068**

---

Criminal Appeal from the
Court of Common Pleas of Mahoning County, Ohio
Case No. 18 CR 262A

**BEFORE:**
Gene Donofrio, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Affirmed

---

*Atty. Paul Gains*, Prosecutor, *Atty. Ralph Rivera,* Assistant Prosecutor, Mahoning County Prosecutor's Office, 21 West Boardman Street, 6th Floor, Youngstown, Ohio 44503, for Plaintiff-Appellee and

*Atty. James Wise*, Hartford & Wise Co., LPA, 91 West Taggart, East Palestine, Ohio 44413, for Defendant-Appellant.

Dated:
August 19, 2021

**Donofrio, J.**

{¶1}    Defendant-appellant, Michael Sherman, appeals from a Mahoning County Common Pleas Court judgment convicting him of complicity to commit aggravated murder with a firearm specification, following a jury trial.

{¶2}    On March 3, 2018, appellant was at his friend Alexus Lochrane's house at 149 Rhoda Avenue in Youngstown.  Also present with appellant and Alexus were Mark Winlock, Danny Sullivan, Kaylee Farr, and Leigha Wycoff.  The group decided they were going to use counterfeit money to steal marijuana from Brandon Wareham.  Alexus contacted Brandon on "Snapchat" and arranged for him to bring marijuana to 149 Rhoda.

{¶3}    Brandon arrived at the house with his girlfriend, Amara Jenkins.  Brandon was in the driver's seat and Amara was in the passenger seat.  Brandon pulled into the driveway and the two remained in the car.  Kaylee approached the car and asked for the marijuana.  She then told Brandon that she forgot the money and stepped away from the car.

{¶4}    After Kaylee stepped away, Mark, Danny, and appellant ran from the house toward the car.  Mark went to the driver's side window, yelled at Brandon, and shot him.  Brandon managed to back out of the driveway but struck a telephone pole across the street.  Brandon died from the gunshot wounds.  Appellant and the others fled the scene.

{¶5}    On March 29, 2018, a Mahoning County Grand Jury indicted appellant, along with co-defendants Mark and Danny, on one count of aggravated murder in violation of R.C. 2903.01(B)(F), one count of murder in violation of R.C. 2903.02(A)(D), one count of murder in violation of R.C. 2903.02(B)(D), and one count of aggravated robbery in violation of R.C. 2911.01(A)(1)(C)(1).  Each count also carried with it a firearm specification in violation of R.C. 2941.145.  Appellant entered a not guilty plea.

{¶6}    The matter proceeded to a jury trial in January 2020.  Alexus, Kaylee, and Danny all testified against appellant as part of plea deals with plaintiff-appellee, the State

of Ohio. Appellant testified in his own defense. The jury also heard from numerous other witnesses. The jury found appellant guilty by complicity for each charge.

{¶7}    The trial court found that all counts merged with count one for sentencing. It then sentenced appellant to 20 years to life in prison for complicity to commit aggravated murder with an additional three years on the firearm specification for a total sentence of 23 years to life.

{¶8}    Appellant filed a timely notice of appeal. He now raises a single assignment of error. Appellant's assignment of error states:

> THE TRIAL COURT ERRED IN FINDING THE DEFENDANT GUILTY OF COMPLICITY AS THERE WAS INSUFFICIENT EVIDENCE IN WHICH TO CONVICT THE DEFENDANT AND THE FINDING IS AGAINST THE WEIGHT OF THE EVIDENCE.

{¶9}    Appellant argues that his conviction was not supported by sufficient evidence and that the jury's verdict was against the manifest weight of the evidence. Appellant asserts there was insufficient evidence on which to convict him. He contends the state failed to present any evidence that he supported, assisted, encouraged, cooperated with, advised, or incited Mark in Brandon's murder. Appellant asserts the evidence showed that he was merely present at the scene. He states he did not have a weapon and did not offer any assistance. Furthermore, he claims the criminal plan was devised the night before the crime and he was not present when the others discussed it. Finally, appellant argues there was no evidence that he shared in the criminal intent for the robbery or the murder. He asserts no one except Mark even knew a gun would be involved.

{¶10}   Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as a matter of law to support the verdict. *State v. Dickson*, 7th Dist. Columbiana No. 12 CO 50, 2013-Ohio-5293, ¶ 10 citing *State v. Thompkins*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). Sufficiency is a test of adequacy. *Id.* Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* In reviewing the record for sufficiency, the relevant inquiry is whether, after viewing the evidence in the light most

favorable to the prosecution, any rational trier of fact could have found the essential elements proven beyond a reasonable doubt. *Id.*, citing *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). When evaluating the sufficiency of the evidence to prove the elements, it must be remembered that circumstantial evidence has the same probative value as direct evidence. *Id.*, citing *State v. Jenks*, 61 Ohio St.3d 259, 272-273, 574 N.E.2d 492 (1991) (superseded by state constitutional amendment on other grounds).

{¶11}   The jury convicted appellant of complicity to commit aggravated murder, murder, and aggravated robbery. The trial court merged the convictions for sentencing so that appellant was only sentenced on the charge of complicity to commit aggravated murder in violation of R.C. 2903.01(B), which provides in relevant part: "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, * * *."

{¶12}   Pursuant to the complicity statute: "No person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense[.]" R.C. 2923.03(A)(2). A charge of complicity may be stated in terms of the complicity statute or in terms of the principal offense. R.C. 2923.03(F). Although a defendant may be charged in an indictment as a principal, the court may instruct the jury on complicity where the evidence at trial reasonably supports a finding that the defendant was an aider or abettor. *State v. Gonzales*, 151 Ohio App.3d 160, 783 N.E.2d 903, 2002-Ohio-4937, at ¶ 51.

{¶13}   In determining whether appellant's conviction is supported by sufficient evidence, we must consider the evidence put forth by the state.

{¶14}   Amara Jenkins, Brandon's girlfriend, testified as to what happened the day Brandon was killed. Amara testified that she went with Brandon to sell marijuana at 149 Rhoda Avenue in Youngstown. (Tr. 231). When they got to the house, Brandon was driving and she was in the passenger seat. (Tr. 232). They pulled into the driveway and a young blonde girl approached the driver's side of the car. (Tr. 234). Amara stated that the girl asked where the marijuana was, Brandon showed her, and she stated that she had to go get the money. (Tr. 235). Amara testified that after the girl moved away from the car a tall black male ran towards the car. (Tr. 236). She stated that the only part of

the person's face that was visible was from his eyebrows to his nose.  (Tr. 237).  He had a hoodie on and some sort of mask covering part of his face.  (Tr. 237-238).  The man told Brandon to hand over the weed and then shot him.  (Tr. 239).  Amara heard three gunshots.  (Tr. 239).  She stated that Brandon then managed to drive the car into a telephone pole.  (Tr. 239-240).

{¶15}   Amara testified that she did not see anyone else at the scene but that she could not view the entire area.  (Tr. 240, 258).

{¶16}   Annette Makara owned the house at 149 Rhoda where the shooting took place.  Her granddaughter, Alexus, lived there with her at the time.  (Tr. 261).  Annette testified that in the early afternoon Alexus's friends were at her house including Kaylee, Leigha, Mark, Danny, and appellant.  (Tr. 265-266).  She stated that she was cleaning her house with her earbuds in when she saw appellant walk in.  (Tr. 266-267).  Annette testified that appellant was wearing a black hoodie pulled up over his head and some sort of "ski-looking" goggles that covered all of his face except for his nose and mouth.  (Tr. 267-268).

{¶17}   Anton Russell also lived on Rhoda Avenue on the day in question across the street from where the shooting occurred.  Anton testified that in the afternoon on March 3, 2018, he was sleeping and awoke to a loud crash.  (Tr. 284-285).  He looked outside and saw a car crashed into a telephone pole.  (Tr. 285).  Anton then looked at the video from his surveillance camera.  (Tr. 285).  He saw the car coming from 149 Rhoda's driveway into the pole.  (Tr. 285).  He also saw three men come out of the front door of 149 Rhoda prior to the car pulling out.  (Tr. 286).  Then after the car pulled out of the driveway, he saw the three men run around the side of the house.  (Tr. 286).  The prosecutor then played the video for the jury.  (Tr. 288; State's Ex. 36-A).

{¶18}   Alexus was 16 years old on the day of shooting.  She testified that as a result of the shooting, she was charged with complicity to murder with a firearm specification and aggravated robbery.  (Tr. 345-346).  Due to plea negotiations, Alexus stated that she pleaded guilty to reduced charges of kidnapping with a firearm specification.  (Tr. 346).  As part of her plea deal, the state was going to recommend a term of 72 months in the Department of Youth Services and she agreed to testify against appellant.  (Tr. 346, 362).  She testified that when she originally spoke to police, she lied

about what happened because she was scared and did not want the boys to get in trouble. (Tr. 361). Alexus stated she was very close with appellant and Mark. (Tr. 361).

**{¶19}** Alexus testified that on the evening of March 2, 2018, she was at home with Kaylee, Leigha, Mark, and Danny when they discussed robbing a marijuana dealer. (Tr. 350). Specifically, they discussed robbing Brandon. (Tr. 353). The next day, March 3, appellant came to the house along with the others from the night before. (Tr. 350). She stated that the group discussed a plan to rob Brandon for marijuana with counterfeit money. (Tr. 351). Alexus testified that appellant was present for this discussion. (Tr. 351). The group determined that Alexus would contact Brandon via "Snapchat" to come to 149 Rhoda. (Tr. 354-355). Kaylee was going to approach Brandon with counterfeit money. (Tr. 355). And appellant, Mark, and Danny were going to rob Brandon. (Tr. 355).

**{¶20}** When Brandon arrived, Alexus stated that she, Leigha, Mark, Danny, and appellant were on the back porch while Kaylee approached Brandon's car. (Tr. 356). Mark stated that he needed to retrieve something from the house. (Tr. 356). Danny and appellant went with him. (Tr. 356). Alexus testified that the boys then came back out of the house. (Tr. 357). She stated that Mark came out first, followed by Danny and then appellant. (Tr. 357). Alexus stated that while everyone knew they were going to rob Brandon, no one knew Mark was going to shoot him. (Tr. 357-358). After Mark shot Brandon, everyone ran. (Tr. 358).

**{¶21}** Alexus stated that she saw the gun Mark used to shoot Brandon as he was approaching Brandon's car. (Tr. 373-374). She stated that appellant would have also been able to see the gun. (Tr. 374). And she testified that Danny also had a gun but he did not use it. (Tr. 391).

**{¶22}** Danny also testified as part of a plea deal. As part of his plea deal with the state, Danny's murder charge was amended to voluntary manslaughter, a robbery charge was dropped, and the state agreed to recommend a sentence of 14 years. (Tr. 410-411). Danny pleaded guilty to voluntary manslaughter, aggravated robbery, and a firearm specification. (Tr. 410). Danny stated that he lied when he first gave a statement to the police denying any knowledge of what happened. (Tr. 411-412).

**{¶23}** Danny testified that on March 2, 2018, he, Mark, Kaylee, Alexus, and Leigha were at 149 Rhoda and discussed robbing Brandon. (Tr. 412-413). The next day,

March 3, Danny went to 149 Rhoda with appellant. (Tr. 415). Kaylee, Alexus, Leigha, and Mark were also there. (Tr. 415-416). While they were all there, the group decided they were going to rob Brandon for marijuana. (Tr. 416). According to the plan, Kaylee was to give Brandon the money but before she actually gave him the money, appellant, Mark, and Danny were to take the marijuana and go back in the house. (Tr. 417). Danny stated that appellant understood his role in this plan. (Tr. 417). While the plan was being discussed, Danny was aware that Mark had a firearm with him. (Tr. 417). Danny testified that he, appellant and Mark were all wearing "hoodies." (Tr. 417-418). Additionally, he stated they put bandanas on to conceal their identities. (Tr. 418). Danny stated that Mark was the only one with a gun. (Tr. 418). He denied having his gun with him that day. (Tr. 418).

{¶24} When Brandon arrived, Danny stated that he, appellant, and Mark were inside. (Tr. 419). He stated that the three discussed and then decided that they would exit from the front door onto the front porch to catch Brandon off guard. (Tr. 419). When Brandon pulled into the back of the house, Danny stated that he, appellant, and Mark hopped over the porch banister and ran up to Brandon's car. (Tr. 420). He stated that Mark was first, followed by him, and then appellant. (Tr. 420). Danny stated that as they were running toward the car he could see a gun in Mark's hand. (Tr. 412). He then heard Mark tell Brandon to give him the marijuana and then Mark shot Brandon. (Tr. 422). Danny stated that after Mark shot Brandon, they all fled. (Tr. 423). He stated that he and appellant ran in one direction and Mark ran in another direction. (Tr. 424).

{¶25} Kaylee also testified as part of a plea deal with the state. She was also a juvenile at the time of the murder. Kaylee was charged with complicity to murder with a firearm specification and aggravated robbery with a firearm specification. (Tr. 461-462). In exchange for her cooperation, the state amended the charges and Kaylee pleaded guilty to complicity to involuntary manslaughter. (Tr. 462). The state also agreed to recommend that she be sentenced to 36 months in the Department of Youth Services. (Tr. 462). Kaylee testified that she lied when she initially spoke with police. (Tr. 462-463).

{¶26} Kaylee stated that on the night of March 2, 2018, she was at 149 Rhoda Avenue with Alexus, Leigha, Mark, and Danny. (Tr. 464). The group planned to rob

Brandon. (Tr. 464). They contracted him but he was not available that night. (Tr. 464). The next day, March 3, she went back to 149 Rhoda. (Tr. 466). This time she, Alexus, Leigha, Mark, Danny, and appellant were there. (Tr. 466). They again planned to rob Brandon. (Tr. 466). Kaylee stated that they were all involved in the plan. (Tr. 466). She stated that Mark had a firearm on him and was wiping off the bullets and the handle with everyone present. (Tr. 467-468). She stated that her role in the robbery was to go outside and be the decoy. (Tr. 468).

{¶27} When Brandon arrived, Kaylee stated that she went to his car and patted her pockets when he asked her where the money was. (Tr. 469). Next, appellant, Mark, and Danny ran up behind her. (Tr. 469). She stated that Mark yelled at Brandon and then shot him. (Tr. 469, 471). Kaylee testified that all three of the boys had either a bandana or glasses obstructing their faces. (Tr. 470-471). She stated the facial coverings were part of the plan for the robbery. (Tr. 417). After Mark shot Brandon, they all ran. (Tr. 471).

{¶28} Dr. Elizabeth Mooney, a deputy medical examiner with the Cuyahoga County Medical Examiner's Office, performed the autopsy on Brandon's body. Dr. Mooney testified that Brandon received two gunshot wounds, one to the upper chest and one to the arm. (Tr. 515-516). She determined that these gunshot wounds were the cause of his death. (Tr. 522).

{¶29} There was no dispute in the evidence that Mark shot Brandon and that Brandon died as a result of the gunshot wounds he sustained. There was also no dispute that a plan was formed that the group was going to rob Brandon of his marijuana. The only question here is whether the evidence was sufficient to prove that appellant aided and abetted Mark in Brandon's aggravated murder.

{¶30} To support appellant's conviction for aiding and abetting, the evidence had to demonstrate that appellant supported, assisted, encouraged, cooperated with, advised, or incited Mark in the commission of the crime, and that appellant shared Mark's criminal intent. *State v. Johnson*, 93 Ohio St.3d 240, 2001-Ohio-1336, 754 N.E.2d 796, at the syllabus. His intent could be inferred from the circumstances surrounding the crime. *Id.*

**{¶31}** To "aid and abet" is "'[t]o assist or facilitate the commission of a crime, or to promote its accomplishment.'" *Id.* at 243, quoting Black's Law Dictionary (7 Ed.Rev.1999) 69. This can be inferred from the circumstances surrounding the crime. Participation in criminal intent may be inferred from one's presence, companionship, and conduct before and after the offense is committed. *Id.* at 245, citing *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971).

**{¶32}** Here the state presented sufficient evidence that appellant supported, assisted, encouraged, and cooperated with Mark in the shooting.

**{¶33}** Alexus, Kaylee, and Danny all testified that the group formed a plan on March 3, 2018, to rob Brandon of marijuana using counterfeit money. The plan involved contacting Brandon to purchase marijuana and having him come to 149 Rhoda. Kaylee testified that while the group was discussing the plan, Mark had his gun out and was cleaning it. Danny also testified that while the plan was being discussed, Mark had his gun with him. Moreover, Danny stated that while he, appellant, and Mark were running to Brandon's car, he could see the gun in Mark's hand.

**{¶34}** Alexus testified that while the group was outside, Mark stated that he needed to retrieve something from the house. Danny and appellant went with him. Alexus testified that the three then came back out of the house together. She stated that she could see the gun in Mark's hand as he approached Brandon's car and that appellant would have been able to see it too.

**{¶35}** Annette testified that appellant was wearing a hoodie over his head and some type of goggles. Danny testified that each of the boys was wearing a hoodie and that they put bandanas on to conceal their identities. Kaylee also testified that the boys planned the facial coverings as part of the robbery.

**{¶36}** This evidence, when viewed in the light most favorable to the state, demonstrates that appellant conspired in the robbery plan and knew that Mark would have a gun with him when the robbery was committed.

**{¶37}** Because "a gun is an 'inherently dangerous instrumentality, the use of which is reasonably likely to produce death,' the Supreme Court and this court have found a defendant's knowledge that a gun will be used to commit a crime, or the defendant's assistance in providing a gun to commit a crime, to be evidence that the defendant shared

the principal offender's intent to commit murder." *State v. Young*, 10th Dist. Franklin No. 18AP-630, 2020-Ohio-462, ¶ 63, quoting *State v. Widner*, 69 Ohio St.2d 267, 270, 431 N.E.2d 1025 (1982).

{¶38} The evidence indicates that appellant conspired in the plan to rob Brandon of marijuana and that he knew Mark would have a gun during the robbery. In preparing to execute the plan, appellant donned a hoodie and a facial covering along with his co-defendants. The evidence indicates appellant saw Mark with his gun both while the group discussed the robbery and before Mark approached Brandon's car. And appellant fled the scene with his co-defendants after Mark shot Brandon. As noted above, criminal intent for aiding and abetting may be inferred from one's presence, companionship, and conduct before and after the offense is committed. Thus, the state presented sufficient evidence to support appellant's conviction for complicity to commit aggravated murder.

{¶39} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d 380. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.'" *Id.* (Emphasis sic.). In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. *Id.* at 390.

{¶40} Only when "it is patently apparent that the factfinder lost its way," should an appellate court overturn the jury verdict. *Id.* citing *State v. Woullard*, 158 Ohio App.3d 31, 2001-Ohio-3395, 813 N.E.2d 964 (2d Dist.). If a conviction is against the manifest weight of the evidence, a new trial is to be ordered. *Thompkins* at 387. "No judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." *State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, 775 N.E.2d 498, ¶ 36 quoting Ohio Constitution, Article IV, Section 3(B)(3).

Case No. 20 MA 0068

**{¶41}** In addition to the state's evidence set out above, in determining a manifest weight challenge we must also consider the evidence put forth by the defense.

**{¶42}** Appellant took the stand in his own defense. He testified that on March 3, 2018, he went to Alexus's house with Danny. (Tr. 533). He was wearing a Nike hoodie at the time. (Tr. 534). When they arrived at 149 Rhoda, Alexus, Kaylee, Leigha, and Mark were already there. (Tr. 535). Appellant stated that Mark had his gun out and was cleaning it. (Tr. 537-538). He stated that Mark then went into Alexus's room with the gun and came out without it. (Tr. 544). Appellant testified that someone showed him some "fake" money and said that they were going to use it to get some marijuana. (Tr. 539). Appellant testified that the group planned for Kaylee to go to the marijuana dealer's car, give the dealer the fake money, take the marijuana, and hand it to one of the others. (Tr. 540).

**{¶43}** When appellant went outside with Mark and Danny, he saw Mark run toward the car. (Tr. 542). Appellant did not see that Mark had a gun in his hand. (Tr. 542-543). He stated that when he heard the shots being fired, he ran in the house, grabbed his bag, and ran. (Tr. 543).

**{¶44}** On cross-examination, appellant admitted that he knew the plan was to steal the marijuana. (Tr. 549). He admitted that he, Mark, and Danny did not walk directly up to Brandon's car because they did not want to alert Brandon of the theft that was about to occur. (Tr. 554-556). But he denied that he knew that Mark was going to bring the gun or shoot Brandon. (Tr. 552). He admitted that he lied to police twice when he was interviewed. (Tr. 552).

**{¶45}** Appellant admitted his involvement in the robbery plan and admitted that he fled the scene when shots were fired. While he denied knowing that Mark had a gun, it was up to the jury to decide whether or not to believe him. Although the appellate court acts as the proverbial "thirteenth" juror under the manifest weight of the evidence standard, it rarely substitutes its own judgment for that of the jury's. *Thompkins*, 78 Ohio St.3d at 387. This is because the trier of fact is in the best position to determine the credibility of the witnesses and the weight to be given to the evidence. *Id.* The jury here concluded that appellant was not being truthful when he testified that he did not know

Mark had a gun. We will not second-guess their credibility determination. Thus, the jury verdict is not against the manifest weight of the evidence.

{¶46} Accordingly, appellant's sole assignment of error is without merit and is overruled.

{¶47} For the reasons stated above, the trial court's judgment is hereby affirmed.

Waite, J., concurs.

Robb, J., concurs.

Case No. 20 MA 0068

———————————

For the reasons stated in the Opinion rendered herein, the sole assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Mahoning County, Ohio, is affirmed.  Costs to be waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## <u>NOTICE TO COUNSEL</u>

**This document constitutes a final judgment entry.**